IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RICKY FREEMAN,

                         Plaintiff,                        OPINION & ORDER

    v.

                                                 12-cv-292-wmc

JUSTIN BRANDAU,

                         Defendant.

       Plaintiff Ricky Freeman alleges that defendant Justin Brandau violated his Fourth Amendment rights in arresting him by use of excessive force and without probable cause. In addition to these claims brought pursuant to 42 U.S.C. § 1983, Freeman also asserts state claims under Minnesota law for battery, false imprisonment and assault arising out of the same incident. Defendant Brandau now seeks summary judgment as to all of the alleged counts. (Dkt. #17.) For the reasons that follow, the court will grant defendant's motion in full.

UNDISPUTED FACTS[1]

A. The Parties

       Plaintiff Ricky Freeman is a sixty-year-old resident of Marine on St. Croix, Minnesota. Since 2009, Freeman has worked as a big rig truck driver. For the relevant time period, Freeman was employed by U.S. Special Delivery in Hammond, Wisconsin.

---

[1] The court finds the following facts taken from the parties proposed findings of fact to be material and undisputed, viewing them in a reasonable light most favorable to Freeman as the non-movant.

Defendant Justin Brandau is employed as a Wisconsin State Patrol Trooper based in the Southwest Region post located in Tomah, Wisconsin.  He has been employed as a State Trooper since June 24, 2007.  As a Wisconsin State Trooper, Brandau has law enforcement authority to make arrests for traffic violations, as well as for violations of criminal law, including Juneau County, Wisconsin.

## B.  The Accident

On December 21, 2010, between 8:00 and 9:00 p.m., Freeman was driving a semi truck loaded with 40,000 pounds of freight from Hammond to Milwaukee, Wisconsin. There was an ice storm, so Interstate 90/94 was almost completely covered with ice.  Due to an accident ahead, State Patrol officers had closed both east-bound lanes and diverted all traffic to the nearest exit.

Freeman was having difficulties decelerating sufficiently to compensate for stalled traffic in the right lane.  Seeing that the left lane was clear, he signaled a lane change and merged into the left lane.  Freeman claims at this point to have felt a "bump," but thought he had hit a pothole or his rear wheels had locked up from the ice.  Freeman looked in his mirror again and saw that his back wheels were no longer rotating, causing him to believe that his brakes had locked up.[2]  When looking into his mirror, Freeman claimed to be focused on the back of his semi and did not see a passenger vehicle driven by Jack Moro come to a rest in the median of the road after colliding into the back of his

---

[2] The parties dispute whether Freeman at this point realized that the "bump" he had heard was in fact a car colliding with the back of his semi.

semi.  Freeman also claims to have had no idea that he had been involved in other collisions around the same time.

Freeman followed the detoured traffic off of Exit 61, where Deputy Miltimore had Freeman roll down his window.  The parties dispute whether Miltimore used emergency lights to stop Freeman on the exit.  Miltimore asked Freeman if he knew he had been involved in an accident, to which Freeman replied, "No, sir."  Miltimore then asked Freeman to pull off at the exit's truck stop and wait for him to arrive.  Freeman parked in the truck stop, exited his truck to inspect the trailer, and saw that the rear axle was broken and the DOT bar was pushed into a 90 degree angle.  At this point, Freeman claims to have first realized he had been in an accident.

When Deputy Miltimore arrived at the truck stop, he made Freeman fill out accident forms.  Freeman also began filling out his company's accident forms before Brandau arrived.

Trooper Brandau arrived at the accident scene at approximately 9:00 p.m., when he saw a vehicle in the median of I-90/94 near mile post 60 with severe damage.  There were no other vehicles at the scene that appeared to be involved in the crash.  Trooper Kris Anderson was conducting CPR on an unresponsive female passenger (later identified as Holly Stahl who died as a result of her injuries) with the help of an off-duty deputy. The male driver (later identified as Moro) was still sitting in the vehicle yelling the female passenger's name.  Brandau made contact with Moro and noticed that he had a large laceration on his forehead.  Brandau brought him back to his car and bandaged his head

to stop the bleeding.  Brandau also noticed that Moro's right arm was red and looked like a potential injury from an airbag deployment.

Brandau asked Moro if he could tell him what happened.  Moro stated that "a semi pulled out in front of their vehicle, and they hit the back end of it."  (Def.'s PFOFs (dkt. #36) ¶ 22.)[3]  Brandau asked Moro if he could remember anything else about the crash, but he could not.  In addition to Moro's statements, a semi mud flap with the company name of "U.P. Special" was lying in the debris field of the crash.

## C. The Investigation

After talking to the emergency responders, Deputy Miltimore told Brandau that he stopped the semi that was involved in the crash and that it was parked at the Mobile gas station at exit 61 in New Lisbon.[4]  Miltimore also gave Brandau the accident forms he had Freeman fill out.  Miltimore also provided statements from two other semi

---

[3]  A district court may consider otherwise inadmissible statements "to determine the effect that they would have upon the arresting officers when communicated to them by a presumptively reliable citizen."  *Woods v. City of Chi.*, 234 F.3d 979, 987 (7th Cir. 2000) (finding no error in district court's consideration of third-party statements contained in police reports).  Because Brandau's use of Moro's statements is consistent with that allowed use of hearsay, the court has considered these statements for the limited purpose of the statements' impact on Brandau in assessing whether he had probable cause to arrest Freeman, and not for the truth of the accident's cause.

[4]  While Freeman disputes that he was "stopped" -- claiming that he was heading to the truck stop before speaking with any officer and that an officer did not use "lights and siren" to "stop" him -- the court considers what Brandau was told and the effect that statement would have on Brandau as an arresting officer without needing to resolve whether Freeman was actually "stopped."  There is no evidence contradicting Miltimore's having said he "stopped" the semi, whether he meant that in a legal sense of pulling it over or preventing Freeman from leaving the scene.

drivers, both of whom stated that the driver of the "U.P. Special" truck struck their semis after the initial crash happened, as he was passing them in the left lane. Brandau reviewed all of these statements, confirming the latter two with the semi drivers.

Trooper Brandau arrived at the mobile station, where he saw a "U.P. Special" semi with damage to the trailer, consisting of a broken rear axle and broken rear end protection bars. At that point, Brandau made contact with Freeman, pointed out the damage to his semi, and asked Freeman to explain what happened. According to Brandau, Freeman reported that he was in the right lane travelling eastbound on I-90/94 when he signaled, checked for vehicles, and then changed into the left lane. Brandau contends that Freeman told him he felt a bump, which Freeman characterizes as feeling like he had hit a pothole. (Pl.'s Resp. to Def.'s PFOFs (dkt. #28) ¶ 31.) Freeman also reported to Brandau that he thought his trailer brakes may have frozen or locked up, because his trailer was "pulling heavy." (Def.'s PFOFs (dkt. #36) ¶ 31.)

At this point, defendant Brandau asserts: (1) he also told Freeman that he had struck two other semi trucks after the collision with Moro's car; and (2) Freeman did not respond, but rather crossed his arms and looked down at the ground. Freeman disputes both assertions, as well as the fact that he hit other semis.

Regardless, Brandau believed Freeman was being untruthful in claiming not to know about any other vehicle being involved in his accident. On the contrary, in light of the positioning of Moro's vehicle, the severe damage to Moro's vehicle, the damage to Freeman's semi, and Freeman's alleged collision with two other semi trucks, Brandau believed that Freeman not only knew about the crash, but fled the scene because of it.

**D. The Arrest**

Based on this belief, Brandau then placed Freeman under arrest for one count of hit and run causing death, one count of hit and run causing injury, and two counts of hit and run causing property damage. Brandau used one pair of handcuffs, securing them behind Freeman's back and placed Freeman in the back of his squad car. Freeman states in his affidavit that Brandau "pushed Freeman down onto the bench," but acknowledged at his deposition that Brandau's movement was to ensure that Freeman did not bump his head. (Def.'s Resp. to Pl.'s PFOFs (dkt. #37) ¶ 24.) Freeman contends that the handcuffs were placed too tightly, extending his arms past their normal range of motion, and that his arms were uncomfortably pinned behind his back and buttocks.

The back of Brandau's car is divided by a Plexiglas partition about twelve inches tall and about twenty inches wide separating the two sides. Behind the driver, the compartment is fitted to allow a dog to be contained. On the other side is a hard, aluminum, bench-like seat, which is covered with a black abrasive pad so that passengers would not slide on the smooth, metal surface. The Plexiglas allows a passenger to see the dog if the dog stood up, but the dog is not able to have contact with the passenger. While Brandau's car is, therefore, equipped to carry passengers, there were other "more human-friendly" squad cars available in the parking lot where Freeman could have been placed. (Pl.'s PFOFs (dkt. #29) ¶ 25.)

Freeman was kept in the squad car for 56 minutes, during which time a dog was in the backseat on the other side of the Plexiglas barrier. During this time, Brandau was generally in the parking lot speaking to other law enforcement personnel, although he

would periodically enter the car, sometimes asking Freeman for information.  Freeman never complained of any pain or discomfort or asked Brandau to loosen the handcuffs.[5] Freeman also contends that the dog barked incessantly during the entire time he was in the car (except when Brandau entered the car and instructed the dog to stop barking).  At his deposition, Brandau acknowledged that the dog was barking during the incident, but it is undisputed that Freeman also did not mention any discomfort due to the barking dog to Brandau.

Freeman was taken out of the squad car at 11:08 p.m., upon the arrival of Officer Marquardt.  Marquardt removed Brandau's handcuffs and replaced them with his own.  Unlike Brandau, Marquardt secured Freeman's hands in front of his body with the handcuffs.  Marquardt placed Freeman in the front seat of his suburban cruiser.  Marquardt then explained Freeman's *Miranda* rights to him, which Freeman agreed to waive.  The two spoke about the accident from 11:19 p.m. to 11:43 p.m.  At no time during this conversation did Freeman complain about Brandau or mention any pain or discomfort.  Marquardt transported Freeman to a hospital for blood alcohol testing, the results of which were negative.  At some later point, Marquardt "unarrested" Freeman.  (Affidavit of Michael Marquardt (dkt. #22) ¶ 17.)  Freeman was never charged with any crimes as a result of this incident.

---

[5] Freeman now contends that he said nothing about the handcuffs because he did not expect to be in them for very long.  In response, Brandau represents that it is his practice to use two sets of handcuffs to ease the pressure on a person's shoulders, but only *if* a person placed in handcuffs complains about discomfort caused by the handcuffs and that person has been compliant.

**E. Alleged Injuries**

In an affidavit, Freeman avers to have "permanent limited range of motion in his shoulder," which developed immediately after this incident and resulted in his having to quit work for U.S. Delivery Service. (Affidavit of Ricky Freeman ("Freeman Aff.") (dkt. #30) ¶¶43-44.) In an earlier deposition, however, Freeman testified that he left work with U.S. Delivery for a position at American Pro Services, which paid "better" and was "easier." (Deposition of Ricky Freeman ("Freeman Depo.") (dkt. #33) 44:4.)[6]

OPINION

The court's function on summary judgment is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine, material issue for trial. *Anderson Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The applicable substantive law dictates which facts are material. *See Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). While the court must view all facts and draw all inferences in the nonmovant's

---

[6] The court does not reach the issue of whether Freeman was injured during his arrest in light of its conclusions that Freeman failed to offer sufficient evidence that Brandau lacked probable cause to arrest or used excessive force in doing so. Freeman's subsequent statement in his affidavit that the alleged injury caused him to leave his employment is, however, discredited by this earlier statement at his deposition. *See Seshadri v. Kasraian*, 130 F.3d 798, 801 (7th Cir. 1997) ("When a party makes damaging admissions in his deposition and then tries to retract them in an affidavit, courts give short shrift to the affidavit.").

favor, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 255; *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). In this case, the court finds that "there is no genuine, dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I.  Federal Law Claims

### A.  False Arrest

Freeman principally avers that Brandau violated his Fourth Amendment right against unreasonable seizures by falsely arresting him. The Fourth Amendment, by virtue of its incorporation into the Fourteenth Amendment, requires a state police officer "to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979). This means that if Brandau had probable cause for detention at the time of Freeman's arrest, he was neither deprived of a constitutional right, nor entitled to redress under § 1983 for that arrest. *See Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012); *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008); *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007).

"The determination of whether an arresting officer has probable cause to arrest an alleged offender turns on whether a reasonable person in the officer's position would have probable cause to believe that an offense has been committed." *Woods v. City of Chi.*, 234 F.3d 979, 987 (7th Cir. 2000). The Supreme Court has noted that "the Constitution

9

does not guarantee that only the guilty will be arrested," but rather that law enforcement can arrest suspects and later release them without invoking any right of redress under § 1983. *Baker* 443 U.S. at 145; *see also United States v. Covelli*, 738 F.2d 847, 854 (7th Cir. 1984) (holding that an arrest is not invalidated if the suspect is later found to be innocent). The inquiry of whether an officer has probable cause to arrest "depends upon whether the facts and circumstances communicated to the arresting officer at the time of the arrest would warrant a reasonable officer in holding such a belief." *Woods*, 234 F.3d at 987.

Brandau arrested Freeman pursuant to Wis. Stat. § 346.67(1), which provides in pertinent part:

> The operator of any vehicle involved in an accident resulting in injury to or death of any person or in damage to a vehicle which is driven or attended by any person shall immediately stop such vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until the operator has fulfilled [certain] requirements.

For the reasons explained below, the court finds that Freeman has failed to put forth sufficient evidence to demonstrate that it was unreasonable for Brandau to believe that Freeman was both involved in an accident and aware of his involvement. While the question of whether it was unreasonable for Brandau to believe that Freeman failed to stop his vehicle "as close" to the accident as possible is more problematic, the court still finds that Brandau was entitled to qualified immunity because it was not clearly established at the time of Freeman's arrest that Brandau could not reasonably conclude

10

Freeman was fleeing the scene based in part on Deputy Miltimore's general characterization that he had "stopped" Freeman.

As an initial matter, all of this discussion would be unnecessary if Brandau had conducted an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), rather than formally arresting Freeman. *See Rabin v. Flynn*, No. 11-3904, 2013 WL 3455689, *3 (7th Cir. July 9, 2013) ("Generally speaking, the Fourth Amendment permits officers to perform an investigatory stop if they have a reasonable and articulable suspicion of wrongdoing."). Here, the record demonstrates that Trooper Brandau had a reasonable suspicion of wrongdoing based on the physical evidence that he observed at the site of the accident. Under current Seventh Circuit law, however, Brandau's use of handcuffs likely converted his investigation of the accident into an arrest requiring probable cause. *Rabin*, 2013 WL 3455689, at *3 ("When an officer's use of force during a *Terry* stop becomes so disproportionate to the purpose of such a stop in light of the surrounding circumstances . . . then the encounter becomes a formal arrest (which must then be justified by probable cause)." (citing *Jewett v. Anders*, 521 F.3d 818, 824-45 (7th Cir. 2008)).[7]

Turning then to whether Brandau had probable cause to arrest, the parties agree that (1) Brandau arrived at the scene of the accident shortly after its occurrence and witnessed the injuries to Moro and fatal injuries to Stahl, as well as the damage to the

---

[7] The Seventh Circuit recognizes certain circumstances where use of handcuffs does not convert an investigatory stop into a formal arrest, but none seem to be present here. *Rabin*, 2013 WL 3455689, at *9 (describing use of handcuffs in an investigatory stop may be appropriate where an "individual stopped for questioning might have a weapon or that he might be involved in criminal activity often associated with violence").

front of Moro's vehicle; (2) Brandau observed substantial evidence that the other vehicle involved had not stopped at the scene of the accident; (3) Officer Miltimore, as a presumably reliable witness, further informed Brandau that the other vehicle (a semi-truck) involved in the accident was "stopped" at a gas station at the nearest exit; (4) Brandau observed significant damage to the back of Freeman's semi trailer; (5) Freeman admitted to Brandau that he felt a "bump" in the back of his semi trailer right before turning off of the freeway; and (6) Brandau did not find Freeman's denials of his awareness that an accident had occurred to be credible.

Freeman argues his statements to Brandau -- that he was unaware of his involvement in an accident and believed the "bump" to be a pothole -- preclude summary judgment. This might be true if *Freeman's* sincerity were at issue, but even if Freeman were completely unaware that his semi trailer had collided with the car driven by Moro, it is *Brandau's* assessment of the situation that matters in a determination of probable cause, rather than the sincerity or even the innocence of the arrestee. *Woods*, 234 F.3d at 987 ("Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters." (quoting *Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998))).

The court does not find, and more to the point, does not believe a reasonable jury could find, that Brandau acted unreasonably in rejecting Freeman's story (and, in turn, to believe that Freeman must have known about the accident) given the totality of the circumstances as known to Brandau at the time of arrest, including (1) the significant damage to both involved vehicles, (2) the visibility of the crashed passenger vehicle from

12

Freeman's driver's side mirror, and (3) the statements of Officer Miltimore that Freeman hit two other vehicles as well.

Perhaps, as plaintiff argues, Brandau arrested Freeman partly due to the emotion of witnessing two young people, one in life-threatening condition, being taken away from the scene of an accident in an ambulance.  Perhaps a *more* reasonable officer would not have placed Freeman under arrest.   But probable cause is an objective standard. *Carmichael v. Vill. of Palatine, Ill.,* 605 F.3d 451, 457 (7th Cir. 2010).   Putting aside Brandau's emotional state at the time of the arrest or what another officer might have done in the same situation, the undisputed facts demonstrate it was reasonable for Brandau to believe that Freeman had both been involved in an accident and was aware of his involvement.

As indicated above, a more difficult question is whether it was reasonable for Brandau to believe that Freeman failed to stop any closer to the scene of the accident because of treacherous road conditions, substantial traffic and the attendant risks of further accidents.  But here again, it is *Brandau's* assessment of the situation that matters. Brandau witnessed the aftermath of a fatal crash and was told that Officer Miltimore "stopped" the semi-truck involved in the crash.  To Brandau, it appeared Freeman was fleeing the scene, despite Freeman's assertions that he had not.

Still, the court is hesitant to find (and need not find) on this record that Brandau's belief that Freeman was fleeing the scene of the accident was reasonable given good reasons for getting off the highway, the fact his back wheels were locked and ambiguity in Miltimore's statement that he had "stopped" Freeman's semi-truck.  This is

13

because Brandau enjoys the protections of qualified immunity if he merely had "arguable" probable cause to arrest Freeman.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013) (applying qualified immunity where "reasonable minds could differ as to the meaning of the law"). "Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).   In determining whether qualified immunity applies, the court examines two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Hernandez*, 711 F.3d at 817 (citing *Pearson*, 555 U.S. at 232).

"To be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotations marks omitted).   While it was certainly "clearly established" that an individual has the right *not* to be arrested without probable cause, the relevant question here is whether it was clearly established that Brandau's reliance on another officer's characterization that he had "stopped" Freeman without otherwise probing that statement rendered unreasonable Brandau's ultimate conclusion that Freeman had not

14

voluntarily pulled over. *See Humphries*, 702 F.3d at 1006 (describing it as plaintiff's burden to defeat "the qualified immunity defense that the defendants raised . . . [by] show[ing] that the due process right she asserts was clearly established by prior case law").

Here, plaintiff has failed to direct the court to case law establishing that Brandau's actions constituted a Fourth Amendment violation or otherwise demonstrate how this violation was clearly established. Indeed, the Seventh Circuit has indicated that "where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." *Duran v. Sirgedas*, 240 Fed. Appx. 104, 115, 2007 WL 1259059, *8 (7th Cir. 2007) (unpublished). An objective assessment of Brandau's situation, therefore, causes this court to find: (1) it is at least arguable that an officer in his position might reasonably believe probable cause existed, (2) no constitutional standard exists to the contrary, and (3) summary judgment is appropriate.

## B. Excessive Force

Freeman also asserts that Brandau used excessive force in requiring him to sit in the back seat of a dog squad car for approximately one hour with his arms restrictively handcuffed behind his back and a dog incessantly barking on the other side of a plexiglass partition. Even when an officer has probable cause to arrest, the Fourth

Amendment prohibits him from employing excessive force. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). "All claims that law enforcement officers have used excessive force in course of arrest, investigatory stop, or other seizure are analyzed under Fourth Amendment and its 'reasonableness' standard." *Sow v. Fortville Police Dept.*, 636 F.3d 293, 303 (7th Cir. 2011); *see also Sanchez v. City of Chi.*, 700 F.3d 919, 926 (7th Cir. 2012). A plaintiff has the burden to show that the force used during the arrest was excessive in relation to the danger he posed to the community or to the arresting officers. *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). An officer's use of force is unreasonable if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (citing *Lester v. City of Chi.*, 830 F.2d 706, 713 (7th Cir. 1987)).

An officer's right to arrest "necessarily carries with it the right to use some degree of physical coercion." *Graham*, 490 U.S. at 396. Freeman does not claim that Trooper Brandau departed from standard policy, statute or constitutional law in using handcuffs on a suspect incident to a lawful arrest, but rather that he used them in such a way that they forced his shoulders out of their normal range of motion, causing permanent injury.[8] There is no general rule in the Seventh Circuit concerning tightly or uncomfortably securing handcuffs. *See Payne v. Pauley*, 337 F.3d 767, 779-80 (7th Cir. 2006) (discussing "handcuff-tightness" cases in other circuits). Other circuits considering this

---

[8] Freeman also argues that because there was "no legal basis" for his arrest, any force used is excessive" (Pl.'s Opp'n (dkt. #27) 14), but the court has already rejected Freeman's claim of wrongful arrest.

issue have required that a plaintiff asserting such a claim must demonstrate that "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009); *see also Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (holding that "unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight"); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (finding officer's refusal to loosen handcuffs at plaintiff's protest and where handcuffs caused bruising that lasted several days constituted excessive force; *Simpson v. McDonough Cnty. Sheriff*, No. 04-1214, 2006 WL 842373, at *4 (C.D. Ill. Mar. 28, 2006) (finding plaintiff did not show excessive force when he never complained of his shoulder hurting, although he had mentioned that he had a bad right shoulder as he was being handcuffed).

Consistent with this line of cases, the Seventh Circuit has held that a "reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him." *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) (holding that an officer acted reasonably when he handcuffed suspect, resulting in suspect's shoulder injury, when the officer was unaware of pre-existing shoulder injury).  Accordingly, absent a contemporaneous complaint by Freeman as to the tightness or location of the handcuffs, or at least some evidence that the pain or

injury caused by the handcuffing was apparent to the defendant, a plaintiff cannot recover for excessive force in a § 1983 claim.

Here, it is undisputed that Freeman did *not* tell Brandau about his discomfort due to the handcuffing; nor has Freeman put forth any evidence that injury from the placement or overtightening of the handcuffs was otherwise apparent to Brandau. Indeed, the court finds no evidence from which a reasonable jury could find in favor of Freeman's excessive force claim premised on his being handcuffed incident to arrest under all the circumstances here.

Freeman's excessive force claim based on his placement next to an incessantly-barking dog is deficient for much the same reason.  No doubt Freeman's placement, even for an hour, next to an incessantly-barking dog on the opposite side of a secured Plexiglas barrier was extremely unpleasant, but the court could find *no* case law establishing that his placement next to a barking dog constituted excessive force. [9]  To the contrary, use of a divided back compartment with a dog on one side appears from this record to be fairly standard police policy.  While Brandau might have shown greater sensitivity by placing Freeman in another, apparently readily-available and more suitable squad car, his failure does not amount to a constitutionally-prohibited use of excessive force.

Moreover, as with the tightening and placement of handcuffs, there is no factual dispute that Freeman never once complained to Brandau or Marquardt about the

---

[9] Even if Freeman could establish that his proximity to a barking dog violated his Fourth Amendment rights, Brandau would be entitled to qualified immunity since he has failed to identify any case law clearly establishing that placement of an arrestee next to a barking dog constituted excessive force.

18

discomfort the dog's barking was causing him.  *See Stainback*, 569 F.3d at 773.  There is also no evidence that Brandau knew the dog was barking during the entire 56 minutes Freeman was in the car, nor that it was distressing Freeman.  On the contrary, the evidence is that whatever happened this one time, the dog generally would stop barking when Brandau returned to the car or within a minute of his leaving, whether or not a suspect was held in the other compartment, and that Brandau had never received a similar complaint in the past.

While the court finds the Freeman has failed to demonstrate a constitutional violation, this holding should not be construed as an endorsement of Brandau's actions.  Brandau's decision to arrest Freeman, complete with handcuffs fastened tightly behind his back and placement in his squad car with a barking dog in the adjoining compartment even though other squad cars were available for holding -- so that he could conduct a further investigation into the cause of the accident and whether Freeman failed to stop as close to its scene as possible -- strikes the court as heavy handed and arguably in poor judgment.  Still, Freeman has produced insufficient evidence to demonstrate that Brandau violated his constitutional rights or, even if he did, that Brandau is not entitled to qualified immunity for his actions.

## II. State Claims

Brandau seeks dismissal of Freeman's state law claims because Freeman failed to comply with Wis. Stat. § 893.82 by filing notice of a claim with the Attorney General within 120 days of the event that gives rise to the suit.  Wis. Stat. § 893.82(3).  The

19

notice of claim statute applies to Freeman's state claims of battery, false imprisonment, and assault.  *See Gumz v. Morrissette*, 772 F.2d 1395, 1404 (7th Cir. 1985), *cert. denied*, 475 U.S. 1123 (1986); *Saldivar v. Cadena*, 622 F. Supp. 949, 959 (W.D. Wis. 1985).

Freeman concedes that he did not serve a timely notice, which dooms his state claims pursuant to Wis. Stat. § 893.82 as well.  Accordingly, the court also will grant summary judgment to defendant on Freeman's remaining state law claims.[10]

---

[10] Because the court has found that defendant is entitled to summary judgment on plaintiff's federal claims, the court would typically dismiss plaintiff's state law claims without prejudice to be refiled in state court.  *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction.").  A court may, however, depart from "usual practice" and continue to exercise supplemental jurisdiction if the circumstances weigh in favor of such action.  For example, there is no reason to send back to state court "'doomed litigation' that will only be dismissed once it gets there."  *Groce*, 193 F.3d at 502.  In such circumstances, the court typically retains supplemental jurisdiction "because when a state-law claim is clearly without merit, it invades no state interest-on the contrary, it spares overburdened state courts additional work that they do not want or need-for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts."  *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) (internal quotation omitted).

ORDER

IT IS ORDERED that:

1) Defendant Justin Brandau's motion for summary judgment (dkt. #17) is GRANTED; and

2) the clerk of court is directed to enter judgment for defendant and close this case.

Entered this 13th day of September, 2013.

BY THE COURT:

/s/

_____

WILLIAM M.  CONLEY
District Judge